**TROC, Inc., Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

**Civ. A. No. 7126.**

United States District Court
N. D. Ohio, W. D.

Sept. 30, 1954.

Smith, Klein & Blumberg, Wm. E. Klein, Toledo, Ohio, for plaintiff.

H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe, Harlan Pomeroy, Sp. Assts. to the Atty. Gen., Sumner Canary, U. S. Atty., Cleveland, Ohio, Clarence M. Condon, Asst. U. S. Atty., Toledo, Ohio, for defendant.

KLOEB, District Judge.

This suit is brought to recover income taxes claimed to have been erroneously and illegally assessed and collected from plaintiff by the defendant, through its authorized officers and agents. Plaintiff prays judgment in the sum of $3,277.83, with interest.

On January 1, 1924, Adah D. Elliott, the owner of certain land located at the corner of Upton Avenue and West Bancroft Street in Toledo, Ohio, executed a ninety-nine year lease, renewable in perpetuity, to The Cort Realty Company, lessee. The annual rental under the terms of the lease was $3,600. Lessee thereafter constructed buildings on this land which it held for rental to tenants. The buildings are low, one-story, masonry structures divided into small store rooms that are rented to various and sundry

businesses that are typical in an outlying street corner section of a city. The income from the rental of these buildings to tenants was the sole income of the lessee. For twelve years after the acquisition of this land by lease and the construction of these buildings, lessee paid to lessor the annual rental of $3,600, but in only three of these years did it operate at a profit. (Stip., par. 10.) In 1928, it had a net income of $541.44; in 1929, it had a net income of $2,591.03; and, in 1930, a net income of $2,467.71. In all of the other years it suffered a net loss that ranged from $240.02 to $4,368.09 per annum.

On October 31, 1936, plaintiff, Troc, Inc., acquired by assignment from The Cort Realty Company the latter's interest in this property. Total consideration required of plaintiff for the acquisition of the property and the assignment of the lease was $13,500.

From late 1936, through 1949, plaintiff paid annual rental of $3,600 to lessor and, at the same time, operated the real estate through rental of the buildings at an annual net profit that ranged from $388.79 to $4,438.79.

On June 15, 1949, plaintiff notified lessor (Pfs. Ex. 6) that under the terms of Article XXVIII of the lease, it desired to exercise an option for the purchase of the land for $60,000. Thereafter, on August 27, 1949 (Pfs. Ex. 10), lessor notified plaintiff that, commencing January 1, 1950, the annual rental would be reduced to $3,000 for a period of five years, and that after that time the annual rental would revert to the original terms of the lease, to wit, $3,600 per year. Plaintiff refused to accept this proposed reduction and again asserted its desire to purchase the land at the option price (Pfs. Ex. 11). The purchase price was paid and the deed was delivered on January 3, 1950. Plaintiff then, after the acquisition of the fee to the land, set up in its income tax return for the fiscal year ending October 31, 1950, $45,000 as representing the actual market value of the land and the difference of $15,000 as representing an amount paid in order to be rid of a burdensome lease. This resulted in a net operating loss for plaintiff's fiscal year ending October 31, 1950 and carry-back losses for fiscal years ending October 31, 1948 and October 31, 1949.

The purchase price, $60,000, was obtained through a loan from Metropolitan Life Insurance Company at an interest rate of 4½%. It thus appears that lessor, up to this point, had expected and received a return of 6% on an estimated valuation of $60,000 on the land; that, in order to preserve its lease, lessor was willing to accept, for a five-year period, a return of 6% on a valuation of $50,000 on the land, to wit, $3,000 per annum, and that plaintiff, after refusing this offer, acquired a position where the annual rental on the land costs it the sum of $2,700 per year or 6% on an estimated valuation of $45,000 per year.

The question posed here is whether a taxpayer that enters into an agreement whereby it obtains both an option to purchase land and a long-term renewable lease of that land, and thereafter purchases the land pursuant to the option, may deduct the difference between the fair market value of the land and the agreed option price as an ordinary and necessary business expense in the year when the option is exercised.

Internal Revenue Code, Section 23, 26 U.S.C., 1952 Edition, reads as follows:

"Deductions from Gross Income.

"In computing net income there shall be allowed as deductions:

"(a) Expenses.

"(1) *Trade or business expenses.*

"(A) In general. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * * and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer had not taken or is not taking title or in which he has no equity. * * *"

Plaintiff offered as a witness Oscar J. Smith, Vice President of plaintiff company and an attorney with considerable experience in local real estate matters. On page 15 of the record, we find this question of the witness and his answer:

"Q. Mr. Smith, when, if you know, did the plaintiff first consider exercising its option to purchase? A. Well, we aways tried to figure out a way how we could be released from the lease. When things got serious in 1948, when it looked like a recession was coming, it was harder to get rentals. It was further aggravated in 1949, at the time of the pre-Korean recession, and we had to do something in order to try to get a fair return for the property, for the building and improvements around the property. The rental figure was too high. In other words, the rental we paid was too high for the rentals we were receiving and did not leave us with a fair return."

On page 19, we find the following:

"Q. What did you do in connection with their offer? A. We rejected it. We felt it was only temporary relief, and it was not enough for what we felt was occurring at that time. We stated we would have to proceed with the exercise of our option because we thought at that time we had some hope for the future."

On page 24 of the record, we find the following question and answer:

"Q. I will ask you, Mr. Smith, from your relationship to the premises in question and knowing the tax valuation of the land for this particular parcel, what, in your opinion, was the market value of that land on or about January 3, 1950? A. I feel the property was worth, the land exclusive of buildings, $45,000.-00. * * *"

Plaintiff also offered as a witness Mr. Claude A. Campbell, a realtor and appraiser of more than thirty-seven years' experience, and he concludes, after applying several methods of arriving at fair market value of the subject land, that $44,675 was a fair value as of the end of 1949.

Defendant offered no witnesses on the question of fair market value.

■ We are convinced, from the evidence, that the purpose of plaintiff in exercising the option to purchase land for $60,000 was to rid itself of a burdensome lease, the rental for the land being excessive. We are of the opinion that plaintiff was correct in assuming that another depression such as confronted its predecessor in ownership, The Cort Realty Company, in the years 1930 to 1936, would be disastrous to the ownership of the subject real estate, and that the better course for it to follow would be to rid itself of a burdensome lease and reduce for itself the annual cost of the use of this land.

Plaintiff relies upon the case of Cleveland Allerton Hotel, Inc., v. Commissioner of Internal Revenue, 6 Cir., 166 F. 2d 805. Paragraph 3 of the syllabus reads as follows:

"Where lessee owning and operating hotel building on leased premises purchased fee from lessor for a price greater than value of land in order to escape from a burdensome lease, lessee was entitled to deduct difference between price paid and amount which evidence established was value of the land, as an expense of doing business in the year when made, though no such separation of consideration was made in the purchase transaction."

■ In the Allerton case plaintiff was originally liable on the long-term lease of the ground. In the case before us plaintiff is the assignee of the lease from The Cort Realty Company and by virtue of the assignment assumed all the obligations of the lease. This appears to be the only distinction in fact between the two cases. It is to be noted, in passing, that there is no suggestion in this case that, at the time plaintiff acquired the interests of The Cort Realty Company, it then had in mind a purchase of the fee in order to better its position. On page 11 of

defendant's brief, this statement is made:

"In short, purchase of the fee was contemplated in 1936 when the lessee's interest was acquired. * *"

The record does not square with this statement. It does bear out the fact that plaintiff operated under the terms and conditions of the lease for a period of thirteen years before notifying lessor of its intention to exercise the option to purchase. Serious consideration of a reduction in the annual rental appears to have begun in 1948. Years of operation, at a narrow annual net return, apparently were sufficient, in the eyes of plaintiff, to convince it that further and continued payment of $3,600 per annum would be excessively burdensome if not outright dangerous for the future existence of the company.

The prayer of the complaint is sustained.

Plaintiff may prepare and file findings of fact and conclusions of law within ten days, drawn in accordance with this memorandum opinion, and defendant may, within ten days thereafter, file any exceptions or suggested additions thereto that it may deem advisable.